UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREATER NEW YORK MUTUAL INSURANCE COMPANY, | ) ) | CASE NO.: 1:21-cv-1032 |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CAMELOT APARTMENTS LLC, | ) | **AND ORDER** |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

Before the Court is Plaintiff/Counter-Defendant Greater New York Mutual Insurance Company's ("GNY") Motion for Partial Summary Judgment on the Counterclaim. (Doc. No. 41.) Defendant/Counter-Plaintiff Camelot Apartments, LLC ("Camelot") opposed the motion (Doc. No. 47), and GNY replied in support (Doc. No. 49).[1]

GNY also filed a Motion to Exclude or Limit the Testimony of Joshua E. Swedlow (Swedlow"). (Doc. No. 40.) That motion to exclude has been fully briefed. (Doc. Nos. 46, 50.) GNY subsequently filed a motion to strike Swedlow's revised expert report. (Doc. No. 51.) That motion to strike has been fully briefed. (Doc. Nos. 54, 55.)

---

[1] Neither party moved for summary judgment on Plaintiff's Complaint.

I.    **Background**

On July 26, 2019, an apartment in Building B at 12225 Huffman Road in Parma, Ohio (the "Building") caught fire.  (Doc. No. 41 at 813; Doc. No. 47 at 1796.)[2]  The fire caused extensive damage to the originating unit and other units in the Building.  (Doc. No. 41 at 813; Doc. No. 47 at 1796.)  The owner of the Building is Defendant Camelot Apartments LLC ("Camelot").  (Doc. 4 at 271 ¶ 3.)

At the time of the fire, the Building was insured by GNY.  Pursuant to policy number 1134M47684 (the "Policy"), the Building was insured against physical loss or damage caused by or resulting from any covered cause of loss unless otherwise limited or excluded by the terms of the Policy.  (Doc. No. 1-1; Doc. No. 4 at 272 ¶ 9.)

To present its claim, Camelot relied upon Jason Marrero, a public adjuster with the Alex N. Sill Company.  (Doc. No. 41-31, Marrero Deposition, 6:19-14; 12:18-25; 13:1-7.)

The following Policy provisions are pertinent to this dispute:

A.    Coverage

1.    Business Income

Business Income means the:

a.    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b.    Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit of Insurance is shown in

---

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

the Declarations:

> (1)     Business Income Including "Rental Value".
>
> (2)     Business Income Other Than "Rental Value".
>
> (3)     "Rental Value".
>
> If option (1) above is selected, the term Business Income will include "Rental Value".  If option (3) above is selected, the term Business Income will mean "Rental Value" only.
>
> If Limits of Insurance are shown under more than one of the  above options, the provisions of this Coverage Part apply separately to each.
>
> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.
>
> With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:
>
> > (a)     The portion of the building which you rent, lease or occupy; and
> >
> > (b)     Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

(Doc. No. 1-1 at 100.)

C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

3

1.      Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the amount of Net Income and operating expense or amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.  Each party will:

a.      Pay its chosen appraiser; and

b.      Bear the other expenses of the appraisal and umpire equally.

(Doc. No. 1-1 at 104.)

After securing detailed repair proposals, GNY issued advance payments in the following amounts on the following dates: $50,000 (7/31/19); $2,199,038.64 (9/9/19) (in response to a request for $250,000 from Camelot); $1,277,872.68 (10/10/19); $467,029.16 (1/8/20); $741,257.25 (2/24/21); $152,961.70 (5/5/20), and $36,941.41 (8/21/20)). (Doc. No. 41-26; Doc. No. 41-31, Marrero Deposition, 38:8-15; 141:18-25; 142:1-3; Doc. No. 41-44, Doc. No. 41-45.) By August 2020 Camelot had received $4,183,843.59 in Policy advances.  (*See id.*).

Camelot did not hire a restoration contractor until November 9, 2020, approximately 16 months after the fire.  (Doc. No. 41-26; Doc. No. 41-31, Marrero Deposition, 38:9-15; 141:18-25; 142:1-3; Doc. No. 41-32; Doc. No. 41-33, Millstein Deposition, 36:17-25; 47:1-13; 49:15-25.)  Building repairs could not start until repair plans were approved by the local building department.  This did not occur until December 28, 2020, around 18 months after the fire.  (Doc. No. 41-31, Marrero Deposition, 23:15-20; Doc. No. 41-41.)

When the parties reached an impasse over certain damage repair issues, GNY invoked the Appraisal clause of the Policy to resolve the disputes.  (Doc. No. 1-2; Doc. No. 4 at 272 ¶ 13.)

On August 25, 2020, GNY reiterated its demand for appraisal. (Doc. No. 1-4.)   An Appraisal Panel is a three-member panel of experts to resolve disputes over the "amount of loss" arising under a claim. (Doc. Nos. 1-1, 1-2; Doc. No. 4 at 272 ¶¶ 14-15.)

The Appraisal Panel was composed of Mr. Woods on behalf of GNY and Mr. Elmer on behalf of Camelot.  (*See id.*)  Woods and Elmer agreed upon the appointment of Mr. Walsh as the umpire.  (*Id.*)  Under the Policy, an Appraisal Award would be binding on the parties.  (*See* Doc. No. 1-1 at 97-98.)  GNY and Camelot agreed that the Appraisal would encompass "the entirety of the Building portion of this claim."  (Doc. No. 4 at 273 ¶ 32.)

On October 2, 2020, during the Appraisal process, Camelot submitted a Proof of Loss for the Building repairs of $8,546,240.10.  (Doc. No. 41-27.)  One month later, Mr. Marrero advised Camelot that the $8.5 million Proof of Loss included known non-recoverable damages, such as a sprinkler system and replacement of all windows and sliding doors.  (Doc. No. 41-43.)  Mr. Marrero advised Camelot: "The $8MM estimate is not an accurate reflection of what needs to be done so we are unable to pursue that amount for this claim." (*Id.*)  The record does not contain evidence that Camelot ever withdrew that Proof of Loss.

On February 21, 2021, the Appraisal Panel issued an appraisal award signed by Umpire Walsh and Appraiser Woods (the "Award").  (Doc. No. 4 at 273 ¶ 23; Doc. No. 41-30.)  The Award was $5,767,592.86.  Following the Award, GNY paid the balance of the Awarded amount (i.e., the amount not previously advanced or paid).  (Doc. No. 41-26; Doc. No. 41-31, Marrero Deposition, 38:9-15; 141:18-25; 142:1-3; Doc. No. 4 at 272 ¶ 12.)

The Award was within eight percent of GNY's original estimate of $5,342,746.70.  (Doc. No. 4  at 272 ¶ 12.)  The Award was nearly $3 million less than the over $8.5 million claimed in Camelot's Proof of Loss.  (Doc. No. 41-27; Doc. No. 41-31, Marrero Deposition, 141:13-17.)

The Award deferred resolution of the value of any required Building Code Costs. (Doc. No. 4 at 273 ¶¶ 23-24; *see also* Doc. No. 1-1 at 68 and 84-85.)  The Building Code Costs determination was deferred because the Appraisal Panel awaited an architect's review of applicable codes and the building department's determination of applicable codes based upon the repair drawings.  (Doc. No. 1 at 4 ¶ 25; Doc. No. 4 at 273 ¶ 25; Doc. No. 41-30.[3]

The Policy's Business Income Loss coverage is limited to 12 months following the date of loss.  (Doc. No. 1-1 at 152-53.)

On August 6, 2019, GNY retained the services of forensic accountant Douglas Coombs to calculate the Loss of Business Income claim, consisting of loss of rental income from displaced tenants.  (Doc. No. 41-35.)  Mr. Coombs is a certified public accountant with the firm Matson Driscoll and D'Amico with twenty-two years of experience investigating and evaluating Business Income Loss claims.  (Doc. No. 41-40; Doc. No. 41-46.)

On August 13, 2019, Mr. Coombs requested financial documentation from Camelot.  A few months later, Camelot produced the information to Mr. Coombs.  (Doc. Nos. 41-28, 41-29, 41-36, 41-37, 41-38, 41-39.)  GNY issued payments totaling $459,607 for the 12 months provided for in the Policy.  (Doc. No. 4 at 274 ¶ 24.)  GNY issued payments of: $56,000 on September 19, 2019; $184,000 on October 16, 2019; $66,508 on May 29, 2020; and $153,099 on August 20, 2020. (Doc. No. 41-28.)

Mr. Coombs prepared an expert report laying out his computation method.  (Doc. No. 41-29.)

---

[3] At some point, Mr. Marrero objected to the Appraisal Panel's work and its Award.  Particulars on that dispute are themselves disputed.

Camelot's 12 month claim for Business Income loss of between $55,000 and $58,000 per month apparently did not include a deduction for saved expenses.  (*See* Doc. No. 1-1 at 105; Doc. No. 4 at 279 ¶ 24; Doc. No. 41-2, Carmen Deposition, 51:23-25; 52:1-3; Doc. 41-29; Doc. No. 41-46.)

In response to GNY's Complaint in this Court, Camelot filed a Counterclaim seeking Additional Rents, Increased Repair Costs, and Underpaid Rents as damages. (Doc. No. 4 at 283 ¶¶ 45-47.)  The Counterclaim did not refer to increased mortgage interest costs due to alleged delays Camelot experienced in refinancing the Building's mortgage. (Doc. No. 4 at 276-289.)

GNY issued damage-related discovery requests, including interrogatory number 12 and requests for production numbers 11, 19, and 21.  (Doc. Nos. 41-5, 41-6.)  Camelot never supplemented the discovery responses to describe damages due to increased mortgage interest resulting from delay. (Doc. Nos. 41-7, 41-12, 41-13, 41-16, 41-17, 41-18, 41-23, 41-24.)

On April 25, 2022, the Court entered an Order extending fact discovery to July 28, 2022. (Doc. No. 41-1.)  Camelot's counsel first raised, by email, claims for Increased Mortgage Interest, Extended Business Income, and repair costs that were not submitted to the Appraisal Panel.  (Doc. Nos. 41-4, 41-26.)  Extended Business Income is an additional coverage of the Policy that covers lost rental income during the period of time after repairs are completed but before full tenant occupancy is restored to pre-loss levels. The EBI period is limited to 180 days. (Doc. No. 1-1 at 7.) Camelot did not amend its Counterclaim, supplement its Rule 26 Disclosures, or supplement its written discovery responses to reflect these new damages. (*Compare* Doc. No. 41 at 821-24 *with*  Doc. No. 47.)

As part of a disclosure of repair costs after the close of fact discovery, Camelot presented repair invoices totaling $240,767.77. (*Id.*; *see also* Doc. No. 41-25, Carmen Deposition, 7:16-25; 38:17-25; 39:1-25; 40:1-25; 41:1-17.)

GNY issued a September 2, 2022, meet and confer letter, a Second Set of Requests for Production ("Second RFP Set"), and requested a second corporate designee deposition. (Doc. No. 41-8.) On September 7, 2022, GNY issued a Third Request for Document Production ("Third RFP Set") and reiterated its request for the outstanding request for damage support documentation. (Doc. No. 41-11.)

On October 2, 2022, GNY's counsel reiterated the need to obtain the factual support for the new damages, including the Increased Mortgage Interest Claim. (Doc. No. 41-13.) On October 10, 2022, Camelot indicated that discovery would be supplemented. (Doc. No. 41-14.) On October 17, 2022, GNY inquired again when Camelot would update its Rule 26(a)(1)(A)(iii) damage disclosures, prior discovery responses, and respond to the Second RFP Set. (Doc. No. 41-16.)

On October 19, 2022, Camelot's counsel indicated that a response was forthcoming. (Doc. No. 41-17.) On October 31, 2022, Camelot's counsel noted a belief all outstanding owed discovery had been supplemented and/or answered. (Doc. No. 41-18.) On October 31, 2022, Camelot responded that its expert, Joshua E. Swedlow, would issue a report regarding the Increased Mortgage Interest Claim. (Doc. No. 41-19.) On November 2, 2022, the parties agreed to depose Fred Carmen, Camelot's corporate designee on December 12, 2022, to respond to questions regarding the late disclosed damages, including the Increased Mortgage Interest claim. (Doc. No. 41-20.) On November 24, 2022, Camelot disclosed Mr. Swedlow's report regarding the Increased Mortgage Interest Claim. (Doc. No. 41-22.)

On November 24, 2022, and again on December 2, 2022, GNY inquired again regarding responses to the Second RFP Set. (Doc. Nos. 41-23, 41-24.)  From the void in the record, it appears that Camelot did not respond to the Second RFP Set.  (*See* Doc. No. 41 at 823.)

On December 12, 2022, Camelot presented Mr. Carmen as its corporate designee for a 30(b)(6) deposition. (Doc. Nos. 41-21, 41-25.)  Mr. Carmen testified that he did not know of nor have any evidence regarding Camelot's alleged attempts to refinance the mortgage on the Building. (Doc. No. 41-25, Carmen Deposition, 53:25, 54:1-10.)  Mr. Carmen indicated no knowledge of:

- The date the refinancing process began (*id.* at 54:22-25; 55:1-7);

- The number of mortgage lenders contacted (*id.* at 55:8-12, 19-25);

- The term and rate on the pre-fire mortgage (*id.* at 56:3-16);

- The identity of the current lender (*id.* at 57:13-15);

- The loan balance at the time of the fire (*id.* at 57:25; 58:1-3);

- The submission post-fire of a refinance application (*id.* at 58:13-25);

- Any attempts to renegotiate the mortgage with the current lender (*id.* at 59:1-7);

- Any loan rejections because of pending Building repairs (*id.* at 61:7-23);

- The mortgage rates available to Camelot either before or after the fire (*id.* at 62:5-19);

- Camelot's pre-fire mortgage and current loan interest rate (*id.* at 63:10-20);

- The Building's appraised value (*id.* at 65:23-25, 66:1-8);

- Whether refinancing would occur in the future in order to reduce the current interest rate (*id.* at 66:9-25);

- The existence of documents  responsive to the unanswered Second RFP Set. (*id.* at 78:1-13).

## II.    Law and Analysis

### A.    Standard of Review

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light

most favorable to the party opposing the motion."  *Id.*; *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) and (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law."  *Payne*, 767 F.3d at 530.

Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its claim or defense to defeat the motion for summary judgment.  *See Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).  The mere existence of a scintilla of evidence to support a plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  *Id.*

If a plaintiff pleads facts that prove a flaw in the claim or substantiate a defense, she may plead herself out of federal court.  *See Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (noting that dismissal is warranted "if the facts as alleged are insufficient to make a valid claim or if the claim shows on its face that relief is barred by an affirmative defense").

> A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law.  Thus, although a plaintiff need not anticipate or overcome affirmative defenses . . . if a plaintiff alleges facts sufficient to establish a . . . defense, the district court may dismiss the complaint on that ground.

*O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) (citation omitted).  Courts must look to whether a complaint "affirmatively shows" a legal defect in the claim or a defense thereto.  *Cheatom v. Quicken Loans*, 587 F. App'x 276, 279 (6th Cir. 2014).

## B.    Insurance Contract Interpretation

The parties each frame their arguments on the premise that Ohio law governs the Policy and their insurer-insured relationship.  (*See* Doc. No. 41 at 826-30, 834-36; Doc. No. 47 at 1805-06, 1808-11.)  With no assertion to the contrary, the Court applies Ohio law.  *See generally Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 561 (6th Cir. 2023); *Davis v. Sears, Roebuck & Co.,* 873 F.2d 888, 892 (6th Cir. 1989)); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Under Ohio law, an insurance policy is a contract between the insurer and the insured.  *Huntington Nat'l Bank v. AIG Specialty Ins. Co.*, No. 23-3039, 2024 WL 374571, at *5 (6th Cir. Feb. 1, 2024) (citing *Nationwide Mut. Ins. Co. v. Marsh*, 472 N.E.2d 1061, 1062 (Ohio 1984)).  The interpretation and construction of insurance policies is a matter of law to be determined by

the court using general rules of contract interpretation and construction. *Id.*; *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982).

Under Ohio law, to prevail on a breach of contract claim, a plaintiff must demonstrate the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *CoMa Ins. Agency, Inc. v. Safeco Ins. Co.*, 526 F. App'x 465, 467-68 (6th Cir. 2013); *Doner v. Snapp,* 649 N.E.2d 42, 44 (Ohio Ct. App. 1994); *Am. Sales, Inc. v. Boffo,* 593 N.E.2d 316, 321 (Ohio Ct. App. 1991).

"When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). The court must examine an insurance contract as a whole and presume the language used in the policy reflects the intent of the parties. *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007); *CoMa Ins.*, 526 F. App'x at 467-68 (insurance policy "terms are given their plain meaning and read together as a whole"). "[W]ords and phrases used in an insurance policy must be given their natural and commonly accepted meaning, where they in fact possess such meaning." *Gomolka*, 436 N.E.2d at 1348. "Technical terms will be given their technical meaning, unless a different intention is clearly expressed." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). Where the provisions of an insurance policy are clear and unambiguous, courts must apply the terms as written and not enlarge the contract by implication "nor read into the contract a meaning not placed there by the parties." *Gomolka*, 436 N.E.2d at 1348.

A provision in an insurance policy is ambiguous if it has more than one reasonable interpretation. *See Hacker v. Dickman*, 661 N.E.2d 1005, 1006 (Ohio 1996) ("It is only when a provision in a policy is susceptible of more than one reasonable interpretation that an ambiguity

13

exists in which the provision must be resolved in favor of the insured.").  "A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning."  *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987).

"It is 'well-settled' in Ohio law that, 'where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.'"  *Huntington*, 2024 WL 374571, at *5 (quoting *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988)); *see also Home Indem. Co. of N.Y. v. Village of Plymouth*, 64 N.E.2d 248, 250 (Ohio 1945) ("Courts universally hold that policies of insurance, which are in language selected by the insurer and which are reasonably open to different interpretation, will be construed most favorably to the insured.").  In other words, when the parties have offered their own separate interpretations of policy language, both of them plausible, the court must "resolve any uncertainty in favor of the insured."  *Neal-Pettit v. Lahman*, 928 N.E.2d 421, 424 (Ohio 2010).  Because "insurance policies are interpreted strictly against the insurer, it will not suffice for [an insurer] to demonstrate that its interpretation is more reasonable than the policyholder's."  *Andersen v. Highland House Co.*, 757 N.E.2d 329, 333 (Ohio 2001) (quotation and citation omitted).

"Exclusions of coverage must be clear and unambiguous to be enforceable."  *Neal-Pettit*, 928 N.E.2d at 424.  The insurer, as the drafter, "is responsible for ensuring that the policy states clearly what it does and does not cover."  *Id.* at 425.  "[T]o defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question." *Andersen*,

757 N.E.2d at 332 (quotation omitted). Where exceptions, qualifications, or exemptions have been added to an insurance contract, there is a general presumption that anything not clearly excluded by such provisions is included in the insured's coverage. *Id.* In other words, "if a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered." *Id.* At the same time, the court will not read language into the contract. *See Neal-Pettit*, 928 N.E.2d at 425.

> An insured "has the burden of proving a loss and demonstrating coverage under the policy." *Sharonville v. Am. Emps. Ins. Co.*, 846 N.E.2d 833, 838 (Ohio 2006) (quoting *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.*, 418 N.E.2d 1381, 1383 (Ohio 1981)). An insurer bears the burden of proving the applicability of an exclusion to its policy. *Continental Ins. Co. v. Louis Marx Co., Inc.*, 415 N.E.2d 315, 317 (Ohio 1980).

*Huntington*, 2024 WL 374571, at *6.

### C. Ohio Revised Code § 3929.25

Camelot's brief in opposition to summary judgment references Section 3929.25. (*See* Doc. No. 47 at 1796, 1802, 1805, 1806, 1809, 1812-13, 1817.) That comes as a surprise to the Court, inasmuch as no reference to Section 3929.25 or other insurance statute was pleaded in the Counterclaims. (*See* Doc. No. 4.)[4] Instead, the Counterclaims were premised on enforcing the Policy contract in Counterclaim One (*id.* at 286), as well as the implied covenant of good faith and fair dealing in Counterclaim Two (*id.* at 286-88.)[5]

Ohio law provides in pertinent part:

> A person, company, or association insuring any building or structure against loss or damage by fire or lightning shall have such building or structure examined by

---

[4] GNY argues that Camelot's brief "contains new arguments challenging the validity of the Policy's appraisal clause." (Doc. No. 49 at 2265.) GNY does not argue that Section 3929.25 should be barred or disregarded because it was not pleaded. (*See id.*)

[5] Counterclaim Three, which asserted a fiduciary relationship, previously was dismissed. (Doc. No. 15.) It similarly did not refer to Section 3929.25.

his or its agent, and a full description thereof made, and its insurable value fixed, by such agent.  In the absence of any change increasing the risk without the consent of the insurers, and in the absence of intentional fraud on the part of the insured, *in the case of total loss* the whole amount mentioned in the policy or renewal, upon which the insurer received a premium, shall be paid.  However, if the policy of insurance requires actual repair or replacement of the building or structure to be completed in order for the policyholder to be paid the cost of such repair or replacement, without deduction for depreciation or obsolescence, up to the limits of the policy, then the amount to be paid shall be as prescribed by the policy.

Ohio Rev. Code § 3929.25 (emphases added).

"Ohio law requires insurers to pay out the 'whole amount' of certain policies if there's a 'total loss' to an insured building.  Ohio Rev. Code § 3929.25.  To be a total loss, the building must have lost its identity and specific character as a building.  It must be of no value in repairing or rebuilding."  *Carpenter v. Liberty Ins. Corp.*, No. 22-3508, 2023 WL 6389041, at *4 (6th Cir. Oct. 2, 2023) (case quotations and citations omitted); *see also Paterson-Leitch Co. v. Ins. Co. of N. Am.*, 366 F. Supp. 749, 757 (N.D. Ohio 1973).  "A building loses its identity and specific character when it has been so far destroyed by fire that it can no longer be called a building, and the portions that remain cannot be utilized to advantage in rebuilding it."  *Pennsylvania Fire Ins. Co. v. Drackett*, 57 N.E. 962, 964 (Ohio 1900).

There are cases where the question of whether a fire has caused a total loss can present a fact question for a jury.  *See id.* at 964.  But this is not such a case.  Camelot pleaded that the fire caused "extensive damage" to Building B and the units therein.  (Doc. No. 4 at 279 ¶ 20.)  Further, "[o]n August 12, 2019, Camelot informed GNY of their 'intent to rebuild' and pursue recoverable depreciation under the terms of the policy."  (*Id.* at 280 ¶ 33.)  Camelot admitted in its Answer to the Complaint that Camelot's own appraiser Mr. Ehmer identified additional "building repairs" during the appraisal process.  (*Id.* at 273 ¶ 21.)  Camelot's Counterclaims were predicated on the idea that "the Policy contemplates that parties, including GNY, will act with

16

reasonable speed and efficiency *to repair the damage* caused by a covered loss."  (*Id.* at 278 ¶ 15 (emphasis added).)  The Counterclaims also alleged that GNY "unnecessarily prolonged the *repair and construction* process," which delayed Camelot's completion of repairs and "ability to obtain new tenants."  (*Id.* at 281 ¶ 37 (emphasis added).)  The Counterclaims cited examples of GNY's dilatory tactics during what Camelot described as "the *repair and rehabilitation* process."  (*Id.* at 281-82 (emphasis added).)  Lest there be any doubt about whether repair was possible, Camelot pleaded and confirmed that Building B has been reconstructed.  (*Id.* at 282 ¶ 41.)

Nowhere in its pleading did Camelot mention a total loss.  (*See* Doc. No. 4.)  And nowhere in its pleading did Camelot mention Section 3929.25.  (*See id.*)  Moreover, in an earlier brief filed in this litigation, Camelot characterized this dispute as follows:

> In the present case, an appraisal was performed *for building repair issues*, and an umpire made his award and determination.  However, the appraisals and the umpire's decision specifically deferred an entire item of damages – Code Upgrade Items – from its determination.  The valuation of the umpire's decision is not in question before the Court.  Rather, the question before the Court is the manner by which the Policy dictates that the additional Code Upgrade Items are to be determined.

(Doc. No. 22 at 386 (emphasis added).)   Camelot explained that Code Upgrade Items "are paid for under the Policy for additional costs *incurred during the repair* of the covered building due to changes in the present day building codes, laws and regulations."  (*Id.* at 386 n.1 (emphasis added).)  Nowhere in that earlier brief on the merits did Camelot mention "total loss."  (*See* Doc. No. 22.)

Notwithstanding all of the above, Camelot proclaims in its opposition to GNY's present summary judgment motion that [i]t cannot reasonably be disputed that this matter entails the application of [Section] 3929.25."  (Doc. No. 47 at 1805.)  "Nobody, including GNY, can

17

reasonably argue that the destruction of Building B by fire did not constitute a 'total loss.'"  (*Id.* at 1808-09 n.36.)

For three reasons, that conclusory position is insufficient.  First, as discussed above, the invocation of total loss and Section 3929.25 were not pleaded or argued previously in this case.  This motion is directed to the Counterclaims, on which the plaintiff is Camelot.  A "plaintiff may not expand [its] claims to assert new theories for the first time in response to a summary judgment motion."  *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)).

Second, Camelot does not present evidence in support of its assertion.  Footnote 36 in Camelot's brief does not satisfy Fed. R. Civ. P. 56(c)(1)(A) because there is no record evidence cited to support a finding of total loss.  Footnote 36 also does not satisfy Fed. R. Civ. P. 56(c)(1)(B) because it does not "show" why the materials before the Court would not permit any conclusion other than a total loss.  The test for a total loss "is whether the building has lost its identity and specific character as a building, even though some parts of it still remain standing."  *Paterson-Leitch Co. v. Ins. Co. of N. Am.*, 366 F. Supp. 749, 757 (N.D. Ohio 1973); *Drackett*, 57 N.E. at 964.  Camelot has not directed this Court to material in the record showing that Building B lost its fundamental character as a building.  Nor does Camelot point to evidence that presents a genuine dispute as to material facts on the question of a "total loss" under Ohio law.  It is Camelot's burden to provide some evidence of a triable issue.  *See Street*, 886 F.2d at 1479-80.

Finally, Camelot's interpretation is at odds with the Ohio Supreme Court's construction of Section 3929.25.

[P]ursuant to R.C. 3929.25, where an insured party *sustains a total loss* to property covered under a fire insurance policy *and does not replace such*

18

*property*, that party is entitled to payment of the full face value of the policy absent any change increasing the risk without the consent of the insurer and absent intentional fraud on the part of the insured.

*McGlone v. Midwestern Grp.*, 573 N.E.2d 92, 95 (Ohio 1991) (emphasis added).  Here, Building B was reconstructed.  Building B – with repairs – was able to recommence operations as a rental housing building.

Accordingly, Camelot's belated and unsupported invocation of Section 3929.25 fails under the Rules and on the merits.  "[B]ecause there's no total loss, the statute doesn't apply." *Carpenter*, 2023 WL 6389041, at *4.

### D.    Insurance Policy Contract Construction

GNY seeks partial summary judgment on the Counterclaims, which GNY frames as six contract construction questions under the Policy.  GNY's motion is an amalgam of a request for declaratory judgment and a typical Rule 56 motion that tests the Counter-Plaintiff Camelot's legal entitlement to relief.  *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

A declaratory judgment action can be a proper vehicle to request that the Court construe an insurance policy to settle a coverage dispute.  *See United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019).  This court considers five factors (the "*Grand Trunk* factors") to determine whether the exercise of Declaratory Judgment Act jurisdiction is appropriate:

(1) [W]hether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal

> relations in issue; (3) whether the declaratory remedy is being used merely for
> the purpose of "procedural fencing" or "to provide an arena for a race for res
> judicata;" (4) whether the use of a declaratory action would increase friction
> between our federal and state courts and improperly encroach upon state
> jurisdiction; and (5) whether there is an alternative remedy which is better or
> more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citations

omitted).  "The relative weight of the underlying considerations of efficiency, fairness, and

federalism will depend on facts of the case." *W. World Ins. Co. v. Hoey,* 773 F.3d 755, 759 (6th

Cir. 2014).

    "Because it is almost always the case that if a declaratory judgment will settle the

controversy, . . . it will clarify the legal relations in issue, the inquiries required by [the first] two

factors often overlap substantially." *Cole's Place*, 936 F.3d at 397.  Here, GNY does not clarify

what will be left of its original claim seeking a declaratory judgment.  But the strongest *Grand

Trunk* factor in favor of jurisdiction is the second.  A decision on the requests for summary

declaratory relief in the motion will clarify the parties' legal relation and will clarify aspects of

Camelot's Counterclaims.  The third and fourth factors favor the exercise of jurisdiction because

there is no other proceeding or any state court litigation addressing the same issues as under

review here.

    Upon consideration of these factors, the Court will exercise its discretion to resolve the

issues raised in the motion.  GNY's motion requests summary judgment on six parts of the

Counterclaim and frames the following questions presented.

(1)     Is GNY entitled to summary judgment on Camelot's Additional Rents Claim when GNY paid the full 12 months provided under the Policy?

(2)     Is GNY entitled to summary judgment on Camelot's claim for additional Building repair costs that were not submitted to the Appraisal Panel because the Award is binding and final?

(3)     Is GNY entitled to summary judgment on Camelot's claim for increased mortgage interest damages when Camelot failed to allege or disclose such damages, and when its corporate designee admitted that no refinancing attempts were ever made?

(4)     Is GNY entitled to summary judgment on Camelot's claim of underpaid Business Income loss when Camelot's calculation did not comply with the Policy's formula?

(5)     Is GNY entitled to summary judgment on Camelot's claim for Extended Business Income loss when Camelot failed to allege or disclose such damages?

(6)     Is GNY entitled to summary judgment on Camelot's claim for punitive damages when Camelot has not met its burden of proving that GNY acted with actual malice and the claim was handled with reasonable justification?

(Doc. No. 41 at 812.)

### 1.     Rents for Another Year as Damages

For the first question presented, GNY argues that "Camelot's Counterclaim attempts to perform an end run around the clear and express 12 month Policy limit by alleging that GNY committed some unspecified breach which proximately caused Camelot to sustain an additional year of lost Business Income beyond the Policy's 12 month allotment."  (Doc. No. 41 at 827.) Camelot counters that GNY's first question presented "is essentially an end run at arguing against Camelot's bad faith claim, which GNY does not challenge in its partial motion for summary judgment."  (Doc. No. 47 at 1811.)  Both sides characterize one another's motivations. But in an insurance policy coverage dispute, the Court reviews the language of the policy itself. *CoMa Ins*., 526 F. App'x at 467-48.

GNY's Actual Loss Sustained Endorsement to the Policy provides:

21

We will pay for loss of Business Income on an Actual Loss Sustained basis. This means that instead of a (set dollar) Limit of Insurance, we will pay for loss of Business Income that you sustain during the "period of restoration" that occurs within 12 consecutive months after the date of direct physical loss or damage, unless an AMENDMENT TO LIMITS AND DEDUCTIBLES endorsement is attached to your policy that provides an additional (24 or 36 month) period of coverage.

If Extra Expense is included in the coverage provided by the Coverage Form listed above and included in your policy, we will also pay for loss of Extra Expense on an Actual Loss Sustained basis.  This means that we will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage, unless an AMENDMENT TO LIMITS AND DEDUCTIBLES endorsement is attached to your policy that provides an additional (24 or 36 month) period of coverage.

\* \* \*

"Period of Restoration" means the period of time that:

a. Begins:

   (1)    72 hours after the time of direct physical loss or damage for Business Income coverage; or

   (2)    Immediately after the time of direct physical loss or damage for Extra Expense coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

   (1)    The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality;

   (2)    The date when business is resumed at a new permanent location; or

   (3)    One year after the time of direct physical loss or damage.

(Doc. No. 1-1 at 152-53.)

Notably, the endorsement indicated that an insured had an option to purchase an extension of the above coverage for a period of 24 or 36 months.  (*See id.*)  Camelot did not

purchase that coverage.  Camelot's policy does not contain an amendment to limits and deductible that would provide for an extended period of restoration.  (*See* Doc. No. 1-1; Doc. No. 47-4.)

This Court does not have authority to rewrite commercial contracts or, here, to extend the Period of Restoration and thereby grant another year of rent coverage.  "Where the provisions of the policy are clear and unambiguous, courts cannot enlarge the contract by implication so as to embrace an object distinct from that originally contemplated by the parties." *Certain Underwriters at Lloyds of London v. KG Admin. Servs., Inc.*, No. 20-3063, 2021 WL 1943369 (6th Cir. May 14, 2021) (quoting *Rhoades v. Equitable Life Assurance Soc. of U.S.,* 374 N.E.2d 643, 644 (1978)).  Generally, equitable doctrines "cannot be employed to expand coverage of an insurance policy" for three reasons: "(1) a court cannot create a new contract for the parties; (2) an insurer should not be required to pay for a loss for which it charged no premium; and (3) a risk should not be imposed upon an insurer which it might have denied." *Ins. Co. of N. Am. v. Travelers Ins. Co.*, 692 N.E.2d 1028, 1038 (Ohio Ct. App. 1997).

Camelot points out that given the severity of the fire damage, GNY knew that Building B would not be leasable for more than a year.  (Doc. No. 47 at 1811.)  Further, GNY paid less than the true monthly amount of rent rolls for the year of coverage GNY paid thus far.  (*Id.*)  Camelot argues other bad acts in its opposition brief, but none of it would change the fact that a court "cannot now expand" coverage for equitable considerations.  *Walker on behalf of Est. of Walker v. Albers Ins. Agency*, 134 N.E.3d 896, 901 (Ohio Ct. App. 2019).

The actions and circumstances of which Camelot complains appear to be easily anticipated possibilities.  (*See, e.g.,* Doc. No. 47 at 1812.)  When considering delays among contracting parties and damages arising therefrom, the Ohio Supreme Court instructs that courts

should consider whether such possible delays would be "within the contemplation of the parties at the time the contract was made."  *See Carrabine Const. Co. v. Chrysler Realty Corp.*, 495 N.E.2d 952, 957 (Ohio 1986).  The sort of problems of which Camelot now complains – *e.g.,* a fire causing widespread damage to the insured building, restoration to become tenant-ready taking more than a year to complete, insurer tardiness in approving vendors or estimates, disagreements between insurer and insured on calculation of coverage payout amounts – all would be within the contemplation of the parties when negotiating an insurance policy against fire damage and loss of rental business income.

Camelot could have bargained for or purchased coverage to last for a longer period of time. Similarly, Camelot could have bargained for additional strictures that would cabin GNY's discretion regarding the timing or calculation method for insurer payouts related to loss of tenant rental income.  Such insurance policies certainly are conceivable, though they certainly may cost more.  The bargain cannot now be restruck.

For the reasons above, the Court holds that the 12-month cap in coverage for actual business income under the Policy cannot be extended or revised to cover 18 months or two years, as Camelot suggests.[6]

### 2.    Additional Repair Costs Not Submitted to Appraisal Panel

In the second question presented, GNY seeks summary judgment "on Camelot's claim for additional Building repair costs that were not submitted to the Appraisal Panel" which issued a "binding and final" award.  (Doc. No. 41 at 812.)  Camelot's response is entirely interwoven

---

[6] The Court recognizes that GNY asserts that it paid Camelot for lost rental income and "in full" for the twelve-month period.  (*See* Doc. No. 41 at 812.)  Camelot asserts that GNY paid approximately $459,607 for twelve months of lost income, when the correct amount of such lost income was an additional $260,393, which has not been paid.  If true, then Camelot may be able to recover the additional $260,393.

24

with Section 3929.25 of Ohio law. (*See* Doc. No. 47 at 1812-14.) Camelot argues that GNY's "forcing Camelot's claim into appraisement is a material breach of the subject insurance contract and overt violation of Ohio statutory law, not to mention an act of bad faith without reasonable justification." (*Id.* at 1814.) Camelot's position presumes that the "subject fire caused a total loss to Building B." (*Id.* at 1812.) In the event of a total loss, Section 3929.25 permits an insured to refuse appraisement, Camelot reasons. (*Id.* at 1813.)

Camelot does not suggest that fact disputes preclude the summary resolution of the second question presented. (*See id.* at 1812-16.) Instead, Camelot challenges GNY's entitlement to judgment as a matter of law in light of Section 3929.25. (*Id.*) Put simply, Camelot raises a legal defense on the second question but that defense does not apply. This Court has ruled above that Building B was not a total loss under Section 3929.25, a conclusion based on the caselaw and on Camelot's failure to support its assertion with record evidence. And "because there's no total loss, the statute doesn't apply." *Carpenter*, 2023 WL 6389041, at *4.

It follows that GNY is not liable (on any cause of action) for failing to advise Camelot that due to a total loss, the parties were not bound by appraisement. (*See* Doc. No. 47 at 1813-14.) The statute does not apply here. Nor would GNY have reason to assume that it needed to advise Camelot on this matter for two basic reasons. First, Camelot by its own admission informed GNY at the outset of its intention to repair and rebuild Building B and then to recommence renting to tenants there. Under Ohio law, that perspective means it was not a total loss under Section 3929.25. Second, as this Court explained previously when dismissing Counterclaim Three, GNY was not Camelot's entrusted advisor or fiduciary. (*See* Doc. No. 15.)

For these reasons, the Court grants summary judgment in favor of GNY on Camelot's claim for additional Building repair costs that were not submitted to the Appraisal Panel.

### 3.      Increased Mortgage Interest Cost

With the third question presented, GNY seeks summary judgment on Camelot's claim for increased mortgage interest damages.  (Doc. No. 41 at 812.)  Camelot cites "increased refinancing costs" as a "necessary part of Camelot's Replacement Cost Value," which Camelot contends are not excluded under the terms of the Policy.  (Doc. No. 47 at 1814-15.)

GNY moves for summary judgment on the mortgage interest damages explicitly on the grounds that Camelot never pleaded a request for such damages nor disclosed them during fact discovery.  (Doc. No. 41 at 831.)   Camelot's opposition brief does not contest either of those charges.  (*See* Doc. No. 47.)  Nor does Camelot respond to the following assertions of undisputed fact in GNY's motion.

28.    . . . The Counterclaim did not seek, allege, or demand increased mortgage interest costs due to alleged delays Camelot experienced in refinancing the Building's mortgage ("Increased Mortgage Interest Claim").  (Dkt. 4, Camelot Counterclaim, PageID# 276-289).

29.    GNY issued specific damage related discovery requests, including interrogatory number 12 and requests for production numbers 11, 19, and 21. (Ex. 5, Response to First Set of Interrogatories and Ex. 6, Response to First Set of Requests to Produce).  Despite six meet and confer requests over eight months, Camelot never supplemented these discovery responses to support an Increased Mortgage Interest Claim.  (Ex. 7, 2/2/22 Email; Ex. 12, 10/4/22 Email; Ex. 13, 10/4/22 Email; Ex. 16, 10/17/22 Email; Ex. 17, 10/19/22 Email; Ex. 18, 10/31/22 Email; Ex. 23, 11/24/22 Email; and Ex. 24, 12/2/22 Email).

30.    On April 25, 2022, the Court entered an Order extending fact discovery to July 28, 2022. (Ex. 1, 4/25/22 Order).  After the close of fact discovery, Camelot's counsel first raised, by email, claims for Increased Mortgage Interest, Extended Business Income and repairs costs that were not submitted to the Appraisal Panel.  (Ex. 26, 1/26/21 Email and Ex. 4, 8/29/22 Email).

31.    Camelot never amended its Counterclaim, supplemented its Rule 26 Disclosures or supplemented its written discovery responses to reflect these new damage claims.

(Doc. No. 41 at 821-22.)

Under Fed. R. Civ. P. 26(a)(1)(A)(iii), "a party must, without awaiting a discovery request, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."

It is undisputed that Camelot did not plead a request for mortgage interest costs in its original Counterclaims, or amend its Counterclaims to seek these damages.  (*See* Doc. No. 4 at 288-89; *see also* Doc. No. 41 at 821.)  Camelot also does not dispute that the initial disclosure of these damages occurred after fact discovery closed.  Camelot's opposition brief contains no citations to documents produced during discovery that support its claim for increased mortgage interest.  (*See* Doc. No. 47 at 1815-16.)

The Sixth Circuit has held that where a plaintiff failed to provide a critical piece of the damages puzzle, a district court did not abuse its discretion in concluding that the plaintiff "came up short in meeting its Rule 26 obligations."  *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 369 (6th Cir. 2010).  When "a party fails to provide information . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Camelot does not argue that its failure to timely disclose its damages and supporting evidence was either substantially justified or harmless.

The Court finds that Camelot's claim for increased mortgage interest is unsupported and GNY's motion for partial summary judgment is granted as to increased mortgage cost damages.

*See Celotex*, 477 U.S. at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . .").

### 4.      Business Income Loss

In the fourth question presented, GNY requests summary judgment on Camelot's claim of underpaid Business Income loss.

As previously referenced, Camelot argues:

> The minimal rent loss that Camelot disputes is the difference in these per month amounts for the total of 18 months (12 months rent loss and additional 6 months) that remains due and payable under the policy. GNY has merely paid an approximate $459,607.00 for an average of $25,533.72 under the policy.  Thus, there is minimally due and owing $260,393 remaining under GNY's own calculation under the policy.

(Doc. No. 47 at 1811.)

GNY's reply brief is somewhat unclear and never pinpoints what error, if any, is reflected in the above-quoted figures in Camelot's opposition brief.  (*See id.*; Doc. No. 49 at 2271-72.) GNY points the Court back to the entirety of the report submitted by GNY's accounting expert Mr. Coombs in support of the proposition that GNY's original computations and figures were correct.  (Doc. No. 47 at 1811.)  Further complicating matters is that GNY's reply on this point refers to "underpaid business income," "extended business income," and "additional lost rental income."

In light of the above, the Court denies GNY's request for summary judgment as to any and all business income damages sought by Camelot.  GNY's reply does not provide sufficient precision to enable the Court to rule so broadly.  (*See* Doc. No. 49 at 2271-72.)  Nor does GNY's statement of undisputed facts at Nos. 21 through 27 in the motion provide the precise grounds to hold that no form of business income damages are viable. (*See* Doc. No. 41 at 819-21.)

However, GNY's motion did properly frame the following issue.  GNY moved on the ground that the Policy limited coverage for business income losses to a *net*, rather than *gross*, computation.  (Doc. No. 41 at 834.)  Camelot's opposition brief and evidence does not show the existence of any dispute about what the policy prescribes.  Camelot has not offered any law in support of a gross, rather than net, computation method for rental business income losses.

The insurance policy defines "business income" as "(a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and (b) Continuing normal operating expenses incurred including payroll."  (Doc. No. 1-1 at 100).  The policy applies these definitions in its "Loss Determination" provisions, which outline how the amount of business income loss and extra expenses are calculated.  (*Id.* at 105.)  These provisions do not mention payment of "gross income," but rather confine covered business income loss to net income.  (*Id.*)

"A party claiming insurance coverage has the burden of establishing compliance with all provisions of the insurance policy which are precedent to his right to recover . . . ."  *Walker v. Buck*, 621 N.E.2d 1307, 1309 (Ohio Ct. App. 1993).  "Compliance with some of the policy's conditions precedent does not excuse failure to comply with all of the conditions precedent."  *Mobley v. Philadelphia Indem. Ins. Co.*, 218 F. App'x 456, 463 (6th Cir. 2007).  Camelot claims coverage for rental business income losses.  GNY says that Camelot did not use a net computation as required under the Policy.  Camelot's opposition is silent on that topic.  (*See* Doc. No. 47.)  Camelot has not carried its burden.

Accordingly, the Court grants summary judgment in favor GNY on an issue of law contained within the fourth question presented.  The Court holds that the Policy requires a net computation – not a gross computation – of business income for purposes of coverage of losses of rental business income.  To the extent that Camelot seeks rental business income loss damages

based on a computation of gross income, then such damages are not permitted under the Policy.
*See generally Zeiger v. Shons*, No. 78150, 2001 WL 470175, at *4 (Ohio Ct. App. May 3, 2001).

### 5.    Extended Business Income Loss

Extended business income under the Policy covers lost rental income during the period of time after repairs are completed but before full tenant occupancy is restored to pre-loss levels. The period for this coverage is limited to 180 days.  (Doc. No. 1-1 at 7.)

GNY moves for summary judgment on extended business income loss damages explicitly because Camelot never pleaded a request such damages.  (Doc. No. 41 at 835.)   Camelot's opposition brief does not contradict that assertion.  (*See* Doc. No. 47 at 1815-16.)  However, the Court notes that in the Counterclaims, Camelot did plead that "GNY rejected Camelot's demand for extended loss of business income via letter dated May 1, 2020."  (Doc. No. 4 at 285 ¶ 59.)

Unlike its position as to mortgage interest losses, GNY's motion does not contain a similar argument regarding a total failure to address extended business income losses during discovery.  (*See* Doc. No. 41 at 834-35.)  Unlike the other six questions presented, it did not devote a heading or section to extended business income loss damages.  (*Compare id. with id.* at 826-833, 835-36.)  On reply, GNY relies on a failure to disclose extended business income damages which seems to go beyond what the original motion put forward.  (*Compare* Doc. No. 41 at 834-35 *with* Doc. No. 49 at 2272.)

For the reasons above, GNY has not shown that it is entitled to judgment as a matter of law as to all extended business income loss damages.  Accordingly, summary judgment on the fifth question presented is denied.

### 6.    Bad Faith

Camelot has two pending Counterclaims (or a counterclaim with two counts) for breach of contract and breach of the duty of good faith and fair dealing.  (Doc. No. 4 at 286.)  GNY dealt with those two counts separately in its Answer to the Counterclaims.  (*See* Doc. No. 7 at 317-18.)

GNY did not move for summary judgment as to the entirety of the Counterclaims, nor did GNY move for summary judgment on either individual Counterclaim One or Counterclaim Two. (*See* Doc. No. 41.)  Instead, GNY moved for summary judgment on six discrete issues regarding the Policy and Counterclaims.  (*Id.* at 837.)  Notably, the words "bad faith" do not appear in GNY's statement of the issues to be decided, nor do they appear in the motion's conclusion and request for relief.  (*See id.* at 812, 837.)

In the course of briefing six discrete species of damages, GNY does mention evidence and argument to show its *bona fides*.  (*E.g.,* Doc. No. 41 at 827-28, 835-36.)  But again, GNY did not move this Court for a declaratory judgment – or for a finding – that it acted in good faith or acted without bad faith.  Nonetheless, the reply indicates that GNY would welcome a finding that the assertion of bad faith here is "absurd."  (Doc. No. 49 at 2273.)  But that was not the stated objective of the motion.

For these reasons, the Court does not make a finding of fact on the question of bad faith, nor does the Court reach a legal conclusion regarding bad faith as to Counterclaim One or Counterclaim Two.

### 7.    Punitive Damages

In its sixth question presented, GNY seeks summary judgment on Camelot's request for punitive damages.  (Doc. No. 41 at 812, 835-36.)  GNY argues that "even if Camelot could prove

bad faith (which GNY contends it cannot based upon GNY's reasonably justified handling of the claim as supported by the Award . . .), the burden of proving entitlement to punitive damages is even greater." (*Id.* at 835.)

For a few basic reasons, it would be premature to attempt to decide the availability of punitive damages.  First, the Court is not called upon in this motion to decide the existence or absence of bad faith.  Second, the Court is not called upon in this motion to decide whether there should be *no claim* for breach of contract or covenant of good faith and fair dealing.  Third, the Court is not called upon in this motion to decide that there are no species of damages whatsoever available under either Counterclaim One or Two.  The question of compensatory damages typically precedes consideration of punitive damages.  *See generally Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 728 (6th Cir. 2012); *Motorists Mut. Ins. Co. v. Said*, 590 N.E.2d 1228, 1235 (Ohio 1992), *overruled on other grounds by Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397 (Ohio 1994). The issue can be revisited at or before trial, if appropriate.

For the reasons above, the request for summary judgment on the sixth question presented is denied.

### E.    Motion to Strike

GNY moved the Court to strike an affidavit from Robert Feig, a managing member of Camelot.  (*See* Doc. 51 at 2434; Doc. Nos. 47, 48.)  GNY also moved to strike an affidavit and updated expert report from Mr. Swedlow, Camelot's expert witness.  (Doc. No. 51; Doc. No. 46-13.)

To begin, a motion to strike is designed to remove "redundant, immaterial, impertinent, or scandalous matter" from pleadings – not to remove pieces of evidence.  *See* Fed. R. Civ. P. 12(f).  Based on GNY's arguments for exclusion, the Court's analysis is governed by Rule 37:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure* was substantially justified or *is harmless*.

Fed. R. Civ. P. 37(c)(1) (emphasis added).

GNY complains that Feig's affidavit attaches a payoff letter from the bank holding Camelot's mortgage. (Doc. No. 51 at 2437.)  According to GNY, the "Affidavit of Mr. Feig used by Camelot to oppose the two pending dispositive motions before the Court contains factual information that was sought in discovery, including the mortgage lender's name and contact information, loan number, and loan balance amount."  (*Id.*)

The motion to strike says that "GNY had *no reason to suspect this information existed* based on Camelot's utter failure to disclose any of it in response to discovery requests, in Rule 26 disclosures, 30(b)(6) testimony, and Mr. Swedlow's expert report."  (Doc. No. 51 at 2440 (emphasis added).)  But GNY, as the insurer, knew that Building B was subject to a mortgage, which obviously entails an outstanding mortgage balance and some bank or lender to which that is owed – even though GNY may not have had details on the lender name or payoff amount. And more to the point, the Court has granted partial summary judgment in favor of GNY on the issue of increased mortgage cost damages.  The complained-of aspects of Feig's Affidavit and mortgage payoff letter relate directly to increased mortgage damages that are no longer at issue.

As for Mr. Swedlow's report and affidavit, the motion seeks to exclude them, in part, because they rely on information from the Feig Affidavit and mortgage payoff letter.  To that extent, the Swedlow report and affidavit are effectively mooted.  In those documents, Mr. Swedlow opines on the quantification of certain damages the Court has now ruled out.

GNY seeks to exclude Mr. Swedlow's updated expert report for the additional reason that he added references to data and an updated a damage calculation.  (*See* Doc. No. 51-2.)  As it

happens, the adjustment is to *lessen* the damages calculation by a million dollars.  (Doc. No. 51-2 at 2449.) The Court concludes that the matters complained of in the motion to strike are harmless, and it will not exclude those materials.

For these reasons, GNY's motion to strike is denied.  (Doc. No. 51.)

### F.     Motion to Exclude Expert Witness

GNY moves to "entirely exclude or to limit the proposed accounting testimony of Joshua Swedlow" on various grounds, including a *Daubert* challenge.  (Doc. No. 40.)   This Court does not reach the *Daubert* challenge, as circumstances have changed since this motion was filed. The Court has ruled above that Camelot is not entitled to seek its $2 million theory of damages for increased mortgage refinancing costs.

Mr. Swedlow wrote in his report that "it is my understanding that Camelot is also claiming other damages in addition to those included in this report.  My analysis herein is limited to addressing Camelot's damages with regard to the property refinancing costs."  (Doc. No. 40-1 at 658 ¶ 15.)  Testimony concerning mortgage refinancing costs would be immaterial in light of the Court's ruling.  Whether Mr. Swedlow can or will testify to other matters is a concern for another day.

**III.**     <u>**Conclusion**</u>

For the reasons above, GNY's Motion for Partial Summary Judgment (Doc. No. 41) is

GRANTED IN PART and DENIED IN PART.  GNY's Motion to Strike (Doc. No. 51) is

DENIED.  GNY's Motion to Exclude and/or Limit the Testimony of Joshua E. Swedlow (Doc.

No. 40) is GRANTED IN PART and DENIED IN PART.


**IT IS SO ORDERED.**


**Date**: March 30, 2024                      BRIDGET MEEHAN BRENNAN
                                             UNITED STATES DISTRICT JUDGE