UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREATER NEW YORK MUTUAL INSURANCE COMPANY, | ) ) ) | CASE NO.: 1:21-cv-1032 |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| Plaintiff/Counter-Defendant, | ) ) | |
| v. | ) ) | |
| | ) | **MEMORANDUM OPINION** |
| CAMELOT APARTMENTS LLC, | ) ) | **AND ORDER** |
| Defendant/Counter-Plaintiff. | ) ) | |

Before the Court is Plaintiff/Counter-Defendant Greater New York Mutual Insurance Company's ("GNY") Motion for Summary Judgment to Compel Appraisal Completion (Doc. No. 21; *see also* 39.)  Defendant/Counter-Plaintiff Camelot Apartments, LLC ("Camelot") filed a brief in opposition (Doc. No. 22), and GNY replied (Doc. No. 23).  For the reasons below, the motion is DENIED.

**I.** **Facts**

    **A.** **Background**

On July 26, 2019, an apartment in Building B at 12225 Huffman Road in Parma, Ohio (the "Building") caught fire.  (Doc. No. 41 at 813; Doc. No. 47 at 1796.)[1]  The fire caused extensive damage to the originating unit and other units in the Building.  (Doc. No. 41 at 813; Doc. No. 47 at 1796.)  The owner of the Building is Defendant Camelot Apartments LLC ("Camelot").  (Doc. 4 at 271 ¶ 3.)

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

1

At the time of the fire, the Building was insured by GNY.  Pursuant to policy number 1134M47684 (the "Policy"), the Building was insured against physical loss or damage caused by or resulting from any covered cause of loss unless otherwise limited or excluded by the terms of the Policy.  (Doc. No. 1-1; Doc. No. 4 at 272 ¶ 9.)

To present its claim, Camelot relied upon Jason Marrero, a public adjuster with the Alex N. Sill Company.  (Doc. No. 41-31, Marrero Deposition, 6:19-14; 12:18-25; 13:1-7.)

The following Policy provisions are pertinent to this dispute:

  A.    Coverage

      1.    Business Income

> Business Income means the:
>
>   a.    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
>
>   b.    Continuing normal operating expenses incurred, including payroll.
>
> For manufacturing risks, Net Income includes the net sales value of production.
>
> Coverage is provided as described and limited below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:
>
> > (1) Business Income Including "Rental Value".
> >
> > (2) Business Income Other Than "Rental Value".
> >
> > (3) "Rental Value".
> >
> > If option (1) above is selected, the term Business Income will include "Rental Value".  If option (3) above is selected, the term Business Income will mean "Rental Value" only.
> >
> > If Limits of Insurance are shown under more than one of the  above options, the provisions of this Coverage Part apply separately to each.

2

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.
>
> With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:
>
>> (a) The portion of the building which you rent, lease or occupy; and
>>
>> (b) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

(Doc. No. 1-1 at 100.)

    C.    Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

    1.    Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

    a.    Pay its chosen appraiser; and

      b. Bear the other expenses of the appraisal and umpire equally.

(Doc. No. 1-1 at 104.)

  After securing detailed repair proposals, GNY issued advance payments in the following amounts on the following dates: $50,000 (7/31/19); $2,199,038.64 (9/9/19) (in response to a request for $250,000 from Camelot); $1,277,872.68 (10/10/19); $467,029.16 (1/8/20); $741,257.25 (2/24/21); $152,961.70 (5/5/20), and $36,941.41 (8/21/20)). (Doc. No. 41-26; Doc. No. 41-31, Marrero Deposition, 38:8-15; 141:18-25; 142:1-3; Doc. No. 41-44, Doc. No. 41-45.) By August 2020 Camelot had received $4,183,843.59 in Policy advances. (*See id.*).

  Camelot did not hire a restoration contractor until November 9, 2020, approximately 16 months after the fire. (Doc. No. 41-26; Doc. No. 41-31, Marrero Deposition, 38:9-15; 141:18-25; 142:1-3; Doc. No. 41-32; Doc. No. 41-33, Millstein Deposition, 36:17-25; 47:1-13; 49:15-25.) Building repairs could not start until repair plans were approved by the local building department. This did not occur until December 28, 2020, around 18 months after the fire. (Doc. No. 41-31, Marrero Deposition, 23:15-20; Doc. No. 41-41.)

  When the parties reached an impasse over certain damage repair issues, GNY invoked the Appraisal clause of the Policy to resolve the disputes. (Doc. No. 1-2; Doc. No. 4 at 272 ¶ 13.) On August 25, 2020, GNY reiterated its demand for appraisal. (Doc. No. 1-4.) An Appraisal Panel is a three-member panel of experts to resolve disputes over the "amount of loss" arising under a claim. (Doc. Nos. 1-1, 1-2; Doc. No. 4 at 272 ¶¶ 14-15.)

  The Appraisal Panel was composed of Mr. Woods on behalf of GNY and Mr. Elmer on behalf of Camelot. (*See id.*) Woods and Elmer agreed upon the appointment of Mr. Walsh as the umpire. (*Id.*) Under the Policy, an appraisal award is binding on the parties. (*See* Doc. No.

4

1-1 at 97-98.) GNY and Camelot agreed that the Appraisal would encompass "the entirety of the Building portion of this claim." (Doc. No. 4 at 273 ¶ 32.)

On October 2, 2020, during the Appraisal process, Camelot submitted a Proof of Loss for the Building repairs of $8,546,240.10. (Doc. No. 41-27.) One month later, Mr. Marrero advised Camelot that the $8.5 million Proof of Loss included known non-recoverable damages, such as a sprinkler system and replacement of all windows and sliding doors. (Doc. No. 41-43.) Mr. Marrero advised Camelot: "The $8MM estimate is not an accurate reflection of what needs to be done so we are unable to pursue that amount for this claim." (*Id*.) The record does not contain evidence that Camelot ever withdrew that Proof of Loss.

On February 21, 2021, the Appraisal Panel issued an appraisal award signed by Umpire Walsh and Appraiser Woods (the "Award"). (Doc. No. 4 at 273 ¶ 23; Doc. No. 41-30.) The Award was $5,767,592.86. Following the Award, GNY paid the balance of the awarded sum (*i.e.*, the amount not previously advanced or paid). (Doc. No. 41-26; Doc. No. 41-31, Marrero Deposition, 38:9-15; 141:18-25; 142:1-3; Doc. No. 4 at 272 ¶ 12.)

The Award was within eight percent of GNY's original estimate of $5,342,746.70. (Doc. No. 4 at 272 ¶ 12.) The Award was nearly $3 million less than the over $8.5 million claimed in Camelot's Proof of Loss. (Doc. No. 41-27; Doc. No. 41-31, Marrero Deposition, 141:13-17.) The Policy's Business Income Loss coverage is limited to 12 months following the date of loss. (Doc. No. 1-1 at 152-53.)

On August 6, 2019, GNY retained the services of forensic accountant Douglas Coombs to calculate the Loss of Business Income claim, consisting of loss of rental income from displaced tenants. (Doc. No. 41-35.) Mr. Coombs is a certified public accountant with the firm

5

Matson Driscoll and D'Amico with twenty-two years of experience investigating and evaluating Business Income Loss claims. (Doc. No. 41-40; Doc. No. 41-46.)

On August 13, 2019, Mr. Coombs requested financial documentation from Camelot. A few months later, Camelot produced the information to Mr. Coombs. (Doc. Nos. 41-28, 41-29, 41-36, 41-37, 41-38, 41-39.) GNY issued payments totaling $459,607 for the 12 months provided for in the Policy. (Doc. No. 4 at 274 ¶ 24.) GNY issued payments of: $56,000 on September 19, 2019; $184,000 on October 16, 2019; $66,508 on May 29, 2020; and $153,099 on August 20, 2020. (Doc. No. 41-28.)

Mr. Coombs prepared an expert report laying out his computation method. (Doc. No. 41-29.) Camelot's 12 month claim for Business Income loss of between $55,000 and $58,000 per month apparently did not include a deduction for saved expenses. (*See* Doc. No. 1-1 at 105; Doc. No. 4 at 279 ¶ 24; Doc. No. 41-2, Carmen Deposition, 51:23-25; 52:1-3; Doc. 41-29; Doc. No. 41-46.)

In response to GNY's Complaint in this Court, Camelot filed a Counterclaim seeking Additional Rents, Increased Repair Costs, and Underpaid Rents as damages. (Doc. No. 4 at 283 ¶¶ 45-47.) The Counterclaim did not refer to increased mortgage interest costs due to alleged delays Camelot experienced in refinancing the Building's mortgage. (Doc. No. 4 at 276-289.)

GNY issued damage-related discovery requests, including interrogatory number 12 and requests for production numbers 11, 19, and 21. (Doc. Nos. 41-5, 41-6.) Camelot never supplemented the discovery responses to describe damages due to increased mortgage interest resulting from delay. (Doc. Nos. 41-7, 41-12, 41-13, 41-16, 41-17, 41-18, 41-23, 41-24.)

On April 25, 2022, the Court entered an Order extending fact discovery to July 28, 2022. (Doc. No. 41-1.) Camelot's counsel first raised, by email, claims for Increased Mortgage

6

Interest, Extended Business Income, and repair costs that were not submitted to the Appraisal Panel. (Doc. Nos. 41-4, 41-26.) Extended Business Income is an additional coverage of the Policy that covers lost rental income during the period of time after repairs are completed but before full tenant occupancy is restored to pre-loss levels. The EBI period is limited to 180 days. (Doc. No. 1-1 at 7.) Camelot did not amend its Counterclaim, supplement its Rule 26 Disclosures, or supplement its written discovery responses to reflect these new damages. (*Compare* Doc. No. 41 at 821-24 *with* Doc. No. 47.)

As part of a disclosure of repair costs after the close of fact discovery, Camelot presented repair invoices totaling $240,767.77. (*Id.*; *see also* Doc. No. 41-25, Carmen Deposition, 7:16-25; 38:17-25; 39:1-25; 40:1-25; 41:1-17.)

On September 2, 2022, GNY issued a meet and confer letter, a Second Set of Requests for Production ("Second RFP Set"), and requested a second corporate designee deposition. (Doc. No. 41-8.) On September 7, 2022, GNY issued a Third Request for Document Production ("Third RFP Set") and reiterated its request for the outstanding request for damage support documentation. (Doc. No. 41-11.)

On October 2, 2022, GNY's counsel reiterated the need to obtain the factual support for the new damages, including the Increased Mortgage Interest Claim. (Doc. No. 41-13.) On October 10, 2022, Camelot indicated that discovery would be supplemented. (Doc. No. 41-14.) On October 17, 2022, GNY inquired again when Camelot would update its Rule 26(a)(1)(A)(iii) damage disclosures, prior discovery responses, and respond to the Second RFP Set. (Doc. No. 41-16.)

On October 19, 2022, Camelot's counsel indicated that a response was forthcoming. (Doc. No. 41-17.) On October 31, 2022, Camelot's counsel noted a belief all outstanding owed

7

discovery had been supplemented and/or answered. (Doc. No. 41-18.) On October 31, 2022, Camelot responded that its expert, Mr. Swedlow, would issue a report regarding the Increased Mortgage Interest Claim. (Doc. No. 41-19.) On November 2, 2022, the parties agreed to depose Fred Carmen, Camelot's corporate designee on December 12, 2022, to respond to questions regarding the late disclosed damages, including the Increased Mortgage Interest claim. (Doc. No. 41-20.) On November 24, 2022, Camelot disclosed Mr. Swedlow's report regarding the Increased Mortgage Interest Claim. (Doc. No. 41-22.)

On November 24, 2022, and again on December 2, 2022, GNY inquired regarding responses to the Second RFP Set. (Doc. Nos. 41-23, 41-24.) From the void in the record, it appears that Camelot did not respond to the Second RFP Set. (*See* Doc. No. 41 at 823.)

It was not until December 12, 2022, that Camelot presented Mr. Carmen as its corporate designee for a 30(b)(6) deposition. (Doc. Nos. 41-21, 41-25.) Mr. Carmen testified that he did not know of nor did he have any evidence regarding Camelot's alleged attempts to refinance the mortgage on the Building. (Doc. No. 41-25, Carmen Deposition, 53:25, 54:1-10.) Mr. Carmen indicated no knowledge of:

- The date the refinancing process began (*id.* at 54:22-25; 55:1-7);
- The number of mortgage lenders contacted (*id.* at 55:8-12, 19-25);
- The term and rate on the pre-fire mortgage (*id.* at 56:3-16);
- The identity of the current lender (*id.* at 57:13-15);
- The loan balance at the time of the fire (*id.* at 57:25; 58:1-3);
- The submission post-fire of a refinance application (*id.* at 58:13-25);
- Any attempts to renegotiate the mortgage with the current lender (*id.* at 59:1-7);

8

- Any loan rejections because of pending Building repairs (*id.* at 61:7-23);

- The mortgage rates available to Camelot either before or after the fire (*id.* at 62:5-19);

- Camelot's pre-fire mortgage and current loan interest rate (*id.* at 63:10-20);

- The Building's appraised value (*id.* at 65:23-25, 66:1-8);

- Whether refinancing would occur in the future in order to reduce the current interest rate (*id.* at 66:9-25); or

- The existence of documents responsive to the unanswered Second RFP Set. (*id.* at 78:1-13).

### B. Additional Facts Relevant to Present Motion

As the movant, GNY bears the burden of demonstrating that no material facts are in dispute. *See Matsushita*, 475 U.S. at 58. Camelot submitted the following facts in opposition to GNY's present motion to compel appraisal. (Doc. No. 22 at 387-89.) GNY did not respond to these facts. (*See* Doc. No. 23.) GNY's "burden to respond is really an opportunity to assist the court in understanding the facts. But if [GNY] fails to discharge that burden – for example, by remaining silent – its opportunity is waived and its case wagered." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

After the fire, Camelot submitted its claim to GNY for insurance. (Doc. No. 7 at ¶ 24.) The parties disagreed over the value of the damages caused by the loss. (Doc. No. 1 at ¶ 13.) The parties agreed that the building portion of the claim would be resolved through the appraisal process. (*Id.* ¶ 20.) Camelot chose Mr. Darren Ehmer ("Mr. Ehmer") as its appraiser, and GNY chose Mr. Daniel Woods ("Mr. Woods"). Mr. Ehmer and Mr. Woods chose Mr. Michael J. Walsh as the umpire ("Mr. Walsh" or the "Umpire"). (Doc. No. 22 at 388.) However, the parties agreed that the Code Upgrade Items would be deferred from the appraisal process until an

9

architect and the City of Parma Heights had reviewed the issues. (Doc. No. 1 at ¶ 2.). On or about August 29, 2020, Mr. Woods submitted his appraisal for the claim to Mr. Walsh. (Doc. No. 22-1 at 399 ¶ 15.) Mr. Woods admits that he did not review any documents in connection with fire damages as it relates to Code Upgrade items. (*Id.*; Doc. No. 22-1 at 419-26.)

GNY's Motion does not assert that Camelot agreed that Mr. Ehmer was its chosen appraiser for the Code Upgrade Items, and Camelot says that it never agreed that Mr. Ehmer would be the chosen appraiser for the Code Upgrade Items. (Doc. No. 22-1 at 398 ¶ 9.) The building portion of the claim, and not the Code Upgrade Items, was determined by the Appraisers and Umpire on or about February 12, 2021. (Doc. No. 1 at ¶ 23.) The Award is clear that the Code Upgrade Items were not decided. (Doc. No. 22-1 at 399 ¶¶ 16-17.) After the appraisal of the building portion of the claim was being performed, Camelot and GNY were negotiating on the Code Upgrade Items. (*See id.* ¶¶ 20-21.) GNY disagreed, and demanded an additional appraisal on the Code Upgrade Items. (*Id.* ¶ 22.)

    **II.**    **Law and Analysis**

        **A.**    **Standard of Review**

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears

10

the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). "[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id*.; *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) and (e). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp*., 767 F.3d

11

526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its claim or defense to defeat the motion for summary judgment. *See Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). The mere existence of a scintilla of evidence to support a plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Id.*

### B. Insurance Contract Interpretation

The parties each frame their arguments on the premise that Ohio law governs the Policy and their insurer-insured relationship. (*See* Doc. No. 39 at 542; Doc. No. 22 at 390; Doc. No. 21 at 377.) The Court applies Ohio law. *See generally Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 561 (6th Cir. 2023); *Davis v. Sears, Roebuck & Co.,* 873 F.2d 888, 892 (6th Cir. 1989)); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

To prevail on a breach of contract claim, a plaintiff must demonstrate the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *CoMa Ins. Agency, Inc. v. Safeco Ins. Co.*, 526 F. App'x 465, 467-68 (6th Cir. 2013); *Doner v. Snapp,* 649 N.E.2d 42, 44 (Ohio Ct. App. 1994); *Am. Sales, Inc. v. Boffo,* 593 N.E.2d 316, 321 (Ohio Ct. App. 1991).

12

Under Ohio law, an insurance policy is a contract between the insurer and the insured. *Huntington Nat'l Bank v. AIG Specialty Ins. Co.*, No. 23-3039, 2024 WL 374571, at *5 (6th Cir. Feb. 1, 2024) (citing *Nationwide Mut. Ins. Co. v. Marsh*, 472 N.E.2d 1061, 1062 (Ohio 1984)). The interpretation and construction of insurance policies is a matter of law to be determined by the court using general rules of contract interpretation and construction. *Id.*; *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982).

"When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). The court must examine an insurance contract as a whole and presume the language used in the policy reflects the intent of the parties. *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007); *CoMa Ins.*, 526 F. App'x at 467-68 (insurance policy "terms are given their plain meaning and read together as a whole"). "[W]ords and phrases used in an insurance policy must be given their natural and commonly accepted meaning, where they in fact possess such meaning." *Gomolka*, 436 N.E.2d at 1348. "Technical terms will be given their technical meaning, unless a different intention is clearly expressed." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). Where the provisions of an insurance policy are clear and unambiguous, courts must apply the terms as written and not enlarge the contract by implication "nor read into the contract a meaning not placed there by the parties." *Gomolka*, 436 N.E.2d at 1348.

A provision in an insurance policy is ambiguous if it has more than one reasonable interpretation. *See Hacker v. Dickman*, 661 N.E.2d 1005, 1006 (Ohio 1996) ("It is only when a provision in a policy is susceptible of more than one reasonable interpretation that an ambiguity exists in which the provision must be resolved in favor of the insured."). "A court will resort to

13

extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987).

"It is 'well-settled' in Ohio law that, 'where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.'" *Huntington*, 2024 WL 374571, at *5 (quoting *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988)); *see also Home Indem. Co. of N.Y. v. Village of Plymouth*, 64 N.E.2d 248, 250 (Ohio 1945) ("Courts universally hold that policies of insurance, which are in language selected by the insurer and which are reasonably open to different interpretation, will be construed most favorably to the insured."). In other words, when the parties have offered their own separate interpretations of policy language, both of them plausible, the court must "resolve any uncertainty in favor of the insured." *Neal-Pettit v. Lahman*, 928 N.E.2d 421, 424 (Ohio 2010). Because "insurance policies are interpreted strictly against the insurer, it will not suffice for [an insurer] to demonstrate that its interpretation is more reasonable than the policyholder's." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 333 (Ohio 2001) (quotation and citation omitted).

### C. The Policy's Appraisal Process

The Award was issued by GNY's appraiser and the umpire in February 2021. (Doc. No. 4 at 273 ¶ 23; Doc. No. 41-30.) GNY paid the balance of the amount it owed Camelot pursuant to the awarded amount. (Doc. No. 41-26; Doc. No. 41-31, Marrero Deposition, 38:9-15; 141:18-25; 142:1-3; Doc. No. 4 at 272 ¶ 12.) The question now relates to how the appraisal process

14

should proceed for items and amounts that were *not* resolved in the Award. This turns on one provision in the Policy:

> Appraisal
>
> If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>
> > a. Pay its chosen appraiser; and
> >
> > b. Bear the other expenses of the appraisal and umpire equally.

(Doc. No. 1-1 at 104 § C.1.)

GNY characterizes the appraisal process as if it were ongoing and in stasis. (*See* Doc. No. 39 at 542; Doc. No. 21 at 377.) Camelot counters that the prior process already concluded. "The appraisal and determination of building items other than the Code Upgrade Items is over. To put in GNY's terms, the 'game' is over as it relates to building items outside of the Code Upgrade Items." (Doc. No. 22 at 393.) Following those different perspectives, GNY contends that the previously selected appraisers are still engaged and must be the ones to decide any remaining issues. (Doc. No. 39 at 545-46; Doc. No. 21 at 380-81.) Camelot counters that the Policy does not prohibit the parties from changing their appraiser or otherwise limit the parties to one appraiser for any and all appraisals related to the Policy and dispute. (Doc. No. 22 at 393.)

"An insurance policy is a contract whose interpretation is a matter of law." *Sauer v. Crews*, 18 N.E.3d 410, 413 (Ohio 2014) (quoting *Sharonville v. Am. Emp. Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006)). "[I]f provisions are susceptible of more than one interpretation, they

15

'will be construed strictly against the insurer and liberally in favor of the insured.'" *Id.* (quoting *Sharonville*, 846 N.E.2d at 836).

Had it been the intention of the drafter, the Policy's appraisal clause could have expressly indicated that once a panel of appraisers was selected, *all* amounts in controversy related to a particular incident shall be decided by that the same panel. Section C.1. does not contain any such limitation nor does it express any such intention. The provision indicates that a "decision agreed to by any two [appraisers] will be binding." (Doc. No. 1-1 at 104.) The clause does not indicate that an award will be binding *and further* subject to additions as other loss disputes are resolved in the future.

The Award – signed by GNY's appraiser and the umpire – does not say that the award is subject to addition or revision. (*See* Doc. No. 41-30.) The text of document uses the past tense, suggesting that the appraisers' role was completed.

> We, the undersigned, pursuant to our appointment as Appraisers and Umpire in the appraisal of fire damage to the real property located at l 22225 Hoffman Road, Parma Heights, Ohio 44130 occurring on July 26, 2019 do hereby certify that *we have truly and conscientiously performed the duties assigned to us*, agreeably to the foregoing stipulations, *and have appraised and determined*, and do hereby award the following sum(s) as the Replacement Cost (RC) and the Actual Cash Value (ACV) losses to the said property[.]

(*Id.* at 1151 (emphases added).) Just above the signatures, the appraisers again indicated that their task was complete, inasmuch as they performed the tasks assigned to them.

> We, the undersigned, pursuant to the appraisal language in the involved insurance policy, do hereby certify that *we have truly and conscientiously performed the duties assigned to us* within the appraisal conditions of said insurance policy *have appraised and determined*, and hereby agree to award the above stated figures.

(*Id*. at 1152 (emphases added).) This Award letter is not consistent with GNY's argument in the present motion that the appraisal process remains ongoing.

16

Notably, the appraisers explicitly designated items labeled "Law/Ordinance/Increased Cost of Construction" as being "Undecided" and "Undetermined this date." Yet the Award makes no indication of any ongoing work. (*See* Doc. No. 41-30.) Nor does the Award make any provision to add future sums attributable to as-yet undetermined and undecided items. (*Id.*)

GNY does not analyze the Policy as a whole in support of its proposed interpretation. (*See* Doc. Nos. 39, 23, 21.)

> In determining the plain meaning of an insurance contract, the contract should be read as a whole and each word given its appropriate meaning, if possible. . . . In those instances where the wording of an insurance contract is doubtful or ambiguous, the contract is construed in a manner most favorable to the insured. The basis of this rule is that the insurer – who formulates the insurance contract and proffers it to the insured for the ostensible benefit of the insured in the event of a loss – is responsible for the language employed.

*Burdett Oxygen Co. of Cleveland v. Emps. Surplus Lines Ins. Co.*, 419 F.2d 247, 24-49 (6th Cir. 1969). This Court cannot construct such an argument. A district court is not required to speculate on which portion of the record a party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support a party's position. *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

From the outset of this litigation, GNY referred to the Award as an "interim" award. (*See* Doc. No. 1 at 4 ¶ 23.) The Court has not found any "interim" designation in the Award to support this self-serving label. (*See* Doc. No. 1-5 at 247-56.) On reply, GNY cites its demand letter dated August 25, 2020 requesting appraisal of the entire building claim. (Doc. No. 23 at 472-73 (citing Doc. No. 22-1 at 412).) GNY also cites its appraiser Mr. Woods' letter dated August 29, 2020. (*Id.* (citing Doc. No. 22-1 at 421-26.) That correspondence indicates that that "[t]he appraisal award should include the values for the following items" which included "[a]mount for upgrades required by Code/Ordinance." (Doc. No. 22-1 at 422.) Nonetheless, the

17

fact remains that whatever GNY originally desired or suggested, the did not include the Code and Ordinance upgrades amount. Further, the Award on its face does not say that it is provisional, partial, or subject to change.

GNY invoked and seeks to compel compliance with the appraisal provision from the Policy with the Complaint (Doc. No. 1 at 5-6 ¶¶ 30-37) and with the present motion for summary judgment (Doc. No. 39 at 547-48; Doc. No. 21 at 382-83). This Court is obliged to give effect to the appraisal provision as written – not as it might have been written. With that perspective, three simple questions can be answered from the face of the Policy.

Does the Appraisal Provision expressly require one set of appraisers for all matters or all items? It does not. Does the Appraisal Provision from the Policy expressly indicate that once a set of appraisers has been appointed that no different sent of appraisers could be appointed or used in the future for a different aspect of coverage or another species of losses? It does not. Finally, does the Appraisal Provision expressly indicate that a panel continues to operate or continues to possess authority *after* issuing an award? It does not.

Having considered the exhibits and arguments, the Court concludes that Camelot has the better of the argument. This conclusion follows from the three most pertinent documents, *i.e.,* the Policy, the previous Award, and GNY's motion. As the movant, it is GNY's burden to show that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). That legal showing has not been made.

> D. **Order Compelling Compliance**

In accordance with the Policy (Doc. No. 1-1 at 104), each party will select a competent and impartial appraiser. Those two appraisers will select an umpire. If the two designated appraisers cannot agree on an umpire, then either side may request that the selection be made by

this Court.  If the Court must select an umpire, such a request to the Court must be made by June 3, 2024.

### III. Conclusion

For the reasons above, GNY's Motion for Summary Judgment to Compel Appraisal Completion is DENIED, with an appraisal to follow in accordance with the Policy and this Order.  (Doc. Nos. 21, 39.)

**IT IS SO ORDERED.**

Date: April 23, 2024

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE